# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL T. CONKLIN, JR.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO. 3:20-1712** |
| **v.** | : | **(JUDGE MANNION)** |
| **HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM

Motorcycles, at their most basic level, are designed and manufactured to accelerate and to brake. Plaintiff Michael Conklin was riding his Harley-Davidson motorcycle one day and it failed to perform the latter function, causing him injuries. Conklin believes this malfunction was due to a failure in the design or manufacture of the motorcycle's clutch system. His expert agrees. Harley-Davidson now moves for summary judgment (Doc. 29), arguing Conklin's claims for manufacturing defect, failure to warn, failure to test, and punitive damages cannot go forward. A review of the record reveals sufficient circumstantial evidence for Conklin to move forward with his manufacturing defect claim. The remaining claims, however, are not buttressed by sufficient record evidence. So, the court will **GRANT in part and DENY in part** Harley-Davidson's motion as follows.

## I.   FACTUAL BACKGROUND

The following essential, undisputed facts are taken from the parties' submissions to the extent they are consistent with the evidence in the record. (*See* Docs. 29–35, 39).

Mr. Michael Conklin, an experienced auto mechanic and motorcycle rider, purchased a 2018 Harley-Davidson Street Glide motorcycle (the "Harley" or "motorcycle") in Florida on March 10, 2018. For the almost seven months following, Conklin rode his motorcycle without incident. The Harley underwent a 1,000-mile service without evidence of non-performance of the clutch. Conklin rode the Harley approximately 4,480 miles. During that time, he was able to disengage the clutch of the Harley without any incident. And, on the day of Conklin's accident, he operated the motorcycle without evidence of non-performance of the clutch, including at least eleven actuations thereof prior to the accident. Prior to the incident, Conklin never observed a hydraulic fluid leak or any other problem with the hydraulic clutch system of the Harley. To illustrate, the hydraulic fluid in the hydraulic clutch system goes from a master cylinder, to which the clutch lever is connected, through a line to a secondary clutch actuator (SCA). The piston of the SCA pushes a rod which then disengages the clutch.

- 2 -

Prior to the incident, Conklin was not aware that the hydraulic fluid in the clutch's master cylinder was low or that there could be a leak in the SCA.

On the morning of the incident, September 29, 2018, Conklin worked in his auto garage with Patrick Walker. Around lunchtime, Conklin, along with his wife and son, took a drive. His wife drove in front on her own motorcycle while Conklin traveled behind with his son on his Harley. On the ride, Conklin was headed up a hill when he saw his wife's car and others stopping at a traffic light. Conklin tried to stop the motorcycle by using his front bake only while disengaging the clutch. But the clutch did not disengage. The front wheel then locked, and the Harley went into a skid. Conklin put his right leg out to keep the bike upwards. His leg got wedged between the foot peg and the ground, causing severe injuries to his leg below the knee.

Conklin was able to drive the Harley back to his home without incident. In significant pain, he parked his bike in front of his house and got into a car headed for the hospital. After the incident, Conklin asked Walker to ride the motorcycle to the dealership to have it painted and winterized; he did not ask Walker to have the clutch inspected. Walker rode the motorcycle to the dealership without incident, applied the clutch at least fourteen times without any non-performance of the clutch or brakes.

Before all this, in January of 2018, Harley-Davidson became aware of an incident in Korea in which a crash allegedly occurred involving one of its motorcycles, without injuries, due to a loss of clutch disengagement caused by a leaking secondary clutch actuator. On January 24, 2018, field data showed 92 warranty claims and 10 dealer/customer contacts that appeared to be related to secondary clutch actuator leaks. The numbers climbed steadily over the ensuing months, topping out at 338 warranty claims and 38 customer contacts that appeared to be related to secondary clutch actuator leaks by October 4, 2018.

On February 13, 2018, Harley-Davidson and Brembo, the manufacturer of the SCA, began a joint investigation of warranty return parts. On April 9, Harley-Davidson's Recall Investigation Committee (RIC) initiated a formal investigation. In a Brembo presentation to Harley-Davidson on April 17, Brembo identified three possible root causes of the leakage in the SCA. On May 2, a Brembo presentation explained it had confirmed that both roughness and seal hardness contributed to the leakage, but Brembo could not estimate the rate of failure.

Over the ensuing months, Harley-Davidson continued to monitor the field data monthly. By July, as warranty claims climbed, the RIC's Technical Subcommittee reviewed all available information and shared the data with

- 4 -

the full RIC for its review and input. In August, the full RIC met and decided to reach out to customers that reported they were aware of a clutch issue but still able to safely operate their motorcycles to help evaluate notice or warnings experienced by the rider prior to loss of lift in the clutch. In August and September, Harley-Davidson recovered three clutch systems from recent incidents in Brazil, Sardinia, and Texas, which were installed on an exemplar motorcycle in an attempt to recreate the clutch failure.

On October 4, the full RIC had a meeting and, after further review of the data, it decided to escalate the issue to executive management. On October 11, Harley-Davidson's management made its determination that a safety defect existed in the subject population of motorcycles and declared a recall to remedy the issue.

After Conklin's incident, but before Walker brought the motorcycle to the dealership for painting and winterizing, Harley-Davidson and the National Highway Traffic Safety Administration (NHTSA) announced a voluntary recall of certain Harley-Davidson motorcycles due to the risk of failure of the SCA. On October 22, 2018, Harley-Davidson issued Recall 0173, relating to the potential SCA failure. Conklin's motorcycle was within the recall population.

When Walker took Conklin's Harley to Keystone Harley Davidson for winterizing, the service personnel at the dealership identified Conklin's motorcycle as being within the recall population. Keystone thereafter performed the recall service on the motorcycle and replaced the SCA with a redesigned component. Keystone did not preserve the original SCA that was installed on Conklin's motorcycle.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F.Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and

- 6 -

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). The court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must direct the court's attention to

- 7 -

specific, triable facts by "*citing particular parts* of materials in the record." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added); *see United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)); *see also DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) ("If factual support for [a plaintiff's] claim exist[s] in the record, it [i]s incumbent upon her to direct the District Court's attention to those facts.").

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

Finally, the court is sitting in diversity resolving a matter of state law in this case; thus, "[i]nasmuch as Pennsylvania law governs this action[,] we treat Pennsylvania Supreme Court opinions as binding precedent and Pennsylvania Superior Court opinions as persuasive precedent." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 107 n.2 (3d Cir. 2009).

## III.   DISCUSSION

Harley-Davidson asks the court to enter summary judgment in its favor on Conklin's manufacturing defect, failure to warn, failure to test, and punitive damages claims. The court will address each claim in turn.

### A.   Malfunction Theory of Manufacturing Defect

Harley-Davidson first asks the court to enter summary judgment in its favor on Conklin's manufacturing defect claim. Harley argues Conklin has not come forward with admissible evidence on which a jury could find Conklin's injuries resulted from a manufacturing defect in his Harley. Conklin argues the record contains evidence that would allow him to bring his manufacturing defect claim to a jury, at least on a "malfunction theory." The court agrees.

To proceed on a manufacturing defect theory of strict products liability, Pennsylvania law requires a plaintiff to establish the product suffered from a defect when it left the manufacturer's hands, and that the defect was responsible for causing the plaintiff's injury. *See Williams v. A-Treat Bottling Co.*, 551 A.2d 297, 301 (Pa. Super. Ct. 1988) (citations omitted). In cases where a product or component part fails, a manufacturing defect may be shown by direct evidence, such as evidence that the manufacturer failed to comply with its own procedures or with

- 9 -

accepted manufacturing practice in the industry. *See generally Forry v. Gulf Oil Corp.*, 237 A.2d 593 (Pa. 1968). A manufacturing defect may also be shown by circumstantial evidence under what is called the "malfunction theory." "[W]here the plaintiff is unable to produce direct evidence of a product's defective condition and thus the precise nature of the product's defect, the plaintiff may, in appropriate cases, rely on the 'malfunction theory' of product liability." *Walters v. General Motors Corp.*, 209 F.Supp.2d 481, 486 (W.D. Pa. 2002) (citing *Woodin v. J.C. Penney Co.*, 629 A.2d 974, 975 (Pa. 1993)). ). "Although the malfunction theory 'does not relieve the plaintiff of the burden of establishing a defect,' it 'permits the malfunction itself to serve as circumstantial evidence of a defective condition provided the remaining evidence is sufficient to support the other elements.'" *State Farm Fire & Cas. Co. v. Traditions of Am., LP*, No. 1:20-CV-01114, 2021 WL 8362166, at *7 (M.D. Pa. Dec. 28, 2021), *report and recommendation adopted*, No. 1:20-CV-01114, 2022 WL 1485186 (M.D. Pa. Jan. 28, 2022) (quoting *Walters*, 209 F.Supp.2d at 487).

A review of the record reveals Conklin does not have much by way of direct evidence of a manufacturing defect in his motorcycle. The SCA that allegedly malfunctioned was disposed of after Conklin had the recall kit installed, so neither party was able to examine it for evidence of a defect.

But Conklin may still be able to proceed on a malfunction theory; to be sure, the Pennsylvania Supreme Court has held that a malfunction case can proceed even where "the allegedly defective product has been destroyed or is otherwise unavailable." *Barnish v. KWI Bldg. Co.*, 980 A.2d 535, 539 (Pa. 2009).

So what circumstantial evidence suffices for a plaintiff to survive summary judgment on a malfunction theory of manufacturing defect? Pennsylvania courts look to several pieces of potential evidence:

> (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect.

*Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d 489, 496 (Pa. Super. Ct. 1997) (citing Litvin & McHugh, PENNSYLVANIA TORTS: LAW AND ADVOCACY (1996) §9.33).

The malfunction theory also requires the plaintiff to put forth "evidence eliminating reasonable secondary causes for the accident." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992). "[T]he plaintiff need not negate every theoretically conceivable secondary cause for the accident in question; rather, the plaintiff fails to

- 11 -

establish a *prima facie* case only where the offered proof in itself fairly raises the possibility of secondary causes and then fails to negate the inference that more than one cause could account for the accident." *Walters*, 209 F.Supp.2d at 487 (citing *Dansak*, 703 A.2d at 497).

Here, the record contains several pieces of circumstantial evidence which allow Conklin to proceed to a jury on a malfunction theory. First, Conklin has put forth evidence that his Harley malfunctioned. Conklin, an experienced motorcycle operator and auto mechanic, testified that at the time of the incident when he was attempting to bring the Harley to a stop, the clutch failed to disengage suddenly and unexpectedly, which caused him to lose control of his bike. (*See* Doc. 30-2). Second, Conklin has put forth expert testimony corroborating his testimony that the Harley's SCA malfunctioned. According to Conklin's engineering expert, Mr. David Hallman, Conklin's motorcycle "was defective at the time of this incident due to the internal fluid leak in the Secondary Clutch Assembly (SCA or slave cylinder) which was caused by the design and/or manufacture of the piston and seal assembly." (Doc. 32-9). Mr. Hallman also testified he had no evidence indicating Mr. Conklin did anything that could be considered driver error. (Doc. 30-9).

Third, Conklin has put forth evidence demonstrating several similar incidents involving the same product. (*See* Doc. 35, Exhs. N-1 through N-9, Harley customer contacts with similar issues). Further, Harley instituted a recall of the bike involved in Conklin's accident based on evidence that the SCA manufactured by Brembo was having hydraulic fluid leakage in the actuator piston assembly. (*See* Docs. 32-5, 35-8). Brembo studied the issue and found the root cause of the issue to be that, for the SCAs that failed, the seal was not hard enough and the piston was too rough. (Doc. 35-6). Harley-Davidson communicated with Harley dealers, describing the issue as a "safety defect" which may result in the inability to disengage the clutch and could lead to a loss of control—the same issue Conklin testifies he had. (Doc. 32-5).

Harley-Davidson notes that Conklin admits his Harley was working fine for the near seven months and 4,480 miles he owned the bike before the incident. In *Barnish*, 980 A.2d at 547, the Pennsylvania Supreme Court held "a plaintiff who admits that the product functioned properly in the past must present some evidence explaining how the product could be defective when it left the manufacturers control and yet still function properly for a period of time." Conklin has done so here. For example, he cites several customers Harley communicated with that had a similar clutch failure to

Conklin; those customers noted that, similar to Conklin's experience, their motorcycles' clutches were working fine until they malfunctioned. (*See* Doc. 35, Exhs. N-1 through N-9).

This evidence, if believed and taken as a whole, is sufficient to support a *prima facie* case of Conklin's motorcycle malfunction and elimination of reasonable secondary causes under the malfunction theory. Accordingly, there is a genuine dispute as to whether Conklin's motorcycle failed due to a manufacturing defect, precluding summary judgment.

### B.   Failure to Warn

Conklin's failure to warn claim does not fare as well. In the typical products liability action based on a failure to warn, the plaintiff takes issue with either the absence or inadequacy of warnings, whether they be on the produce itself or in accompanying literature, that would have made an unreasonably dangerous product safer. In this case, Conklin brings his failure to warn claim based on Harley-Davidson's alleged post-sale duty to warn of a defective condition in its motorcycles which it became aware of after it sold Conklin his motorcycle. Conklin appears to bring this post-sale duty to warn claim under both strict liability and negligence theories in his complaint, but in opposing summary judgment he bundles them together as a single claim brought pursuant to the seminal case in Pennsylvania

recognizing a post-sale duty to warn: *Walton v. Avco Corp.*, 610 A.2d 454, 459 (Pa. 1992).

> In *Walton*, a helicopter manufacturer learned of a defect in an engine that it had incorporated into one of its helicopters. *Id.* at 456–57. But the helicopter manufacturer failed to share this information with either the helicopter's service center or owner. *Id.* at 456, 457. The helicopter crashed, killing two people. *Id.* at 456–57. The Pennsylvania Supreme Court held the helicopter manufacturer had an independent duty to warn its service centers and those who purchased the helicopters about the defective engine. *Id.* at 458–59. This duty stemmed from its "subsequent, undisputed knowledge of the defect." *Id.* at 459.

*Liebig v. MTD Prod. Inc.*, No. CV 22-4427, 2023 WL 5517557, at *3 (E.D. Pa. Aug. 25, 2023). The *Walton* court "was careful to ground its ruling in the unusual circumstances of the case," *id.*, including the "peculiarities of the [helicopter] industry," which foster feasibility of continuing communication between manufacturer and end user. *Walton*, 610 A.2d at 459.

The precise bounds of *Walton* have been pondered in Pennsylvania state and federal courts for the last thirty years without any indication of coming to a clear consensus. *Cf. Boyer v. Case Corp.*, No. 97-4540, 1998 WL 205695, at *2 (E.D. Pa. Apr. 28, 1998) ("*Walton* only created a limited and narrow post-sale duty to warn based on the particular facts of the case before the Court.") *and Liebig*, 2023 WL 5517557, at *3 (refusing to extend Walton to manufacturer of snow thrower) *with Padilla v. Black & Decker Corp.*, No. CIV.A. 04-CV-4466, 2005 WL 697479, at *6 (E.D. Pa. Mar. 24,

2005) (permitting *Walton* claim to go forward for defective saw and work bench) *and Trask v. Olin Corp.*, No. CV 12-340, 2016 WL 1255302, at *10 (W.D. Pa. Mar. 31, 2016) (permitting *Walton* claim to go forward at motion to dismiss stage against gun manufacturer since, "[a]s consumer are more connected to sellers in the internet age, the duty to warn may be enlarged."); *see also Habecker v. Clark Equip. Co.*, 797 F.Supp. 381, 388 (M.D. Pa. 1992), *vacated on other grounds*, 36 F.3d 278 (3d Cir. 1994) (explaining the *Walton* decision "appears to be at the vey least in a state of confusion"). In this case, the court will take the same road trodden by other courts dealing with the issue and avoid it for now. *See, e.g., Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F.Supp.2d 606, 642 n.31 (W.D. Pa. 2012) ("Because the [plaintiffs] bring forward no evidence regarding [Defendant] Yamaha's knowledge of the defect presented in this case, the Court need not delve into the propriety of imposing such a post-sale liability on Yamaha to warn secondhand purchasers of any defective golf cars."). That is because, even assuming Harley-Davidson had a post-sale duty to warn of the clutch defect, no reasonable jury could find on this record that Harley-Davidson breached said duty.

Here, Harley-Davidson has met its initial burden as the party moving for summary judgment to affirmatively identify those portions of the record

which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. Harley-Davidson directs the court's attention to a deficiency in Conklin's evidence proffered to support a breach of Harley-Davidson's post-sale duty to warn. The court agrees such evidence appears to be lacking; thus, the burden shifts to Conklin to cite particular evidence in the record on which a reasonable jury could find Harley-Davidson breached its alleged post-sale duty to warn.

First, Mr. Hallman's testimony is of no moment when it comes to Harley-Davidson's purported slackness in warning its customers of the faulty clutch system. That is because Mr. Hallman's "opinion" on that score does not have the requisite reliability required by the Federal Rules of Evidence. Expert testimony may not be admitted at trial unless the proffered testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (2000). Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) that testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 mandates "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The proponent of expert testimony has the burden of establishing that the proffered testimony meets these three requirements by a preponderance of the evidence. *Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).

Conklin's proffered testimony from Mr. Hallman on the adequacy of Harley-Davidson's post-sale warning fails on all three requirements. Mr. Hallman possesses the qualifications to opine on the alleged design or manufacturing defect of the clutch system; however, Conklin fails to establish how Mr. Hallman is qualified to opine on Harley-Davidson's conduct in its recall investigation, including the timing of the eventual recall. Mr. Hallman's engineering expertise does not include experience in the manner in which corporations react to potential safety issues with their products. Conklin also fails to establish Mr. Hallman's conclusory statement in his report—"Prior to September 2018, Harley Davidson was fully aware of the defect in the SCA and should have warned riders/owners of the potential failure and advised rider, owners, and/or Harley Davison technicians to carefully monitor clutch master cylinder fluid levels until a

- 18 -

repair could be made," (Doc. 32-9)—is the product of reliable principles and methods reliably applied to this case. Mr. Hallman's report deals almost exclusively with the potential causes of Conklin's crash. The report does not explain what methodology Mr. Hallman used to conclude Harley-Davidson failed to warn in a timely manner, or how that methodology was applied, if at all. Thus, Mr. Hallman's proffered testimony on Harley-Davidson's response to the potential safety defect posed by the clutch system is unreliable.

Second, this is a case that could certainly benefit from expert testimony. The court will not go as far as Harley-Davidson does to say an expert is required to move forward on all post-sale failure to warn claims. The cases cited by Harley-Davidson in support of that proposition only deal with the requirement of expert testimony to opine on design and manufacturing defects. Experts are also generally needed to opine on the adequacy of a warning affixed to a potentially dangerous product.

In any event, while there may be a case out there based on post-sale duty to warn that does not need expert testimony, this does not appear to be one of them. In this case, an expert would be extremely useful in ascertaining the adequacy and timing of Harley-Davidson's recall investigation and eventual recall of the clutch system. For example, an

expert is needed to opine on exactly when Harley-Davidson had specific, concrete knowledge that the clutch system was a defect that clearly implicated the safety of the motorcycles—not simply that there *may* be an issue with the clutch system that *could* use updating. Such evidence is needed to impose a post-sale duty to warn pursuant to *Walton*, 610 A.2d at 459, in which the duty was based on the defendant's "subsequent, undisputed knowledge of the defect." *See also Lynn*, 894 F.Supp.2d at 642 (*Walton* claim fails for lack of evidence that defendant had "actual, concrete, and undisputed knowledge" of specific safety defect in golf carts).

Dr. Hallman was able to opine based on the complete factual record (including Conklin's crash) that the clutch defect constituted a serious safety issue. (Doc. 32-9). But, for the failure to warn claim, expert testimony is needed for the jury to understand precisely when Harley-Davidson had knowledge that the clutch failure constituted a serious safety issue, potentially implicating its post-sale duty to warn its customers. An expert could also opine on the progression of the recall investigation in relation to industry or administrative standards: *e.g.*, Did Harley-Davidson follow accepted procedure when investigating the clutch failure, or did it impermissibly drag its feet throughout? Should Harley-Davidson have warned all of its customers of a clutch issue when it became aware of one

alleged crash in Korea that apparently involved a clutch malfunction (Doc. 32-5), or was its warning after months of testing and field data analysis adequate when measured against industry standards? This testimony and the like would be seriously helpful to a jury but is completely absent here.

Absent expert testimony, the hypothetical jury is left with the evidence of Harley-Davidson's recall investigation, which lasted approximately from April 2018 to October 2018 and culminated in a recall, but no evidence or expert opinion suggesting the investigation was untimely, inadequate, or otherwise violated a purported post-sale duty to warn.

Therefore, the court finds summary judgment is appropriate in Harley-Davidson's favor. Summary judgment is thus also appropriate on Conklin's claim for punitive damages, which is based on Harley-Davidson's failure to warn. Lastly, Conklin concedes his failure to test claim, for which the court will also enter summary judgment in Harley-Davidson's favor.

## IV.   CONCLUSION

In light of the foregoing, Haley-Davidson's motion for partial summary judgment (Doc. 29) is **GRANTED in part and DENIED in part**. The motion is **DENIED** with respect to Conklin's manufacturing defect claim and **GRANTED** with respect to Conklin's failure to warn/communicate, failure to test, and punitive damages claims. An appropriate order follows.


_____

**MALACHY E. MANNION**
**United States District Judge**

**DATE: September 28, 2023**
20-1712-01